**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JAMUL ACTION COMMITTEE; JAMUL
COMMUNITY CHURCH; DARLA
KASMEDO; PAUL SCRIPPS; GLEN
REVELL; WILLIAM HENDRIX,
　　　　　*Plaintiffs-Appellants*,

v.

E. SEQUOYAH SIMERMEYER,
Chairman of the National Indian
Gaming Commission; DAVID
BERNHARDT, Secretary of the U.S.
Department of the Interior; TARA
KATUK MAC LEAN SWEENEY,
Assistant Secretary - Indian Affairs,
U.S. Department of the Interior;
PAULA L. HART, Director of the
Office of Indian Gaming, Bureau of
Indian Affairs; U.S. DEPARTMENT OF
THE INTERIOR; NATIONAL INDIAN
GAMING COMMISSION; RAYMOND
HUNTER, Chairman, Jamul Indian
Village; CHARLENE CHAMBERLAIN;
ROBERT MESA; RICHARD TELLOW;
JULIA LOTTA; PENN NATIONAL, INC.;
SAN DIEGO GAMING VILLAGE, LLC;
C.W. DRIVER, INC.; UNITED STATES
OF AMERICA,
　　　　　*Defendants-Appellees*.

No. 17-16655

D.C. No.
2:13-cv-01920-
KJM-KJN

OPINION

Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, Chief District Judge, Presiding

Argued and Submitted November 13, 2019
San Francisco, California

Filed September 8, 2020

Before:  William A. Fletcher and Bridget S. Bade, Circuit
Judges, and Barry Ted Moskowitz,[*] District Judge.

Opinion by Judge W. Fletcher

---

**SUMMARY**[**]

---

**Tribal Matters**

The panel affirmed the district court's dismissal for
failure to join a required party in an action challenging the
Jamul Indian Village's efforts to build a casino.

In 1981, a small group of Kumeyaay Indians living on
land in Rancho Jamul, California organized under the Indian
Reorganization Act as the Jamul Indian Village.  The Bureau
of Indian Affairs ("BIA") approved the Village's constitution,

---

[*] The Honorable Barry Ted Moskowitz, United States District Judge
for the Southern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

and the Village has appeared on the BIA's published list of federally recognized Indian tribes ever since.

Two community organizations and several of their members (collectively "JAC") contend that the Village is not a federally recognized Indian tribe.

The panel held that the distinction JAC urges between historic tribes and other tribal entities organized under the Indian Reorganization Act was without basis in federal law. The panel held further that the Jamul Indian Village is a federally recognized Indian tribe with the same privileges and immunities, including tribal sovereign immunity, that other federally recognized Indian tribes possess. The Village's tribal sovereign immunity extends to its officers in this case.

Because the Village was protected by tribal sovereign immunity, the panel agreed with the district court that the Village cannot be joined in this action and that the action cannot proceed in equity and good conscience without it. The panel therefore affirmed the dismissal for failure to join a required party.

---

**COUNSEL**

Kenneth R. Williams (argued), Sacramento, California, for Plaintiffs-Appellants.

Varu Chilakamarri (argued), William B. Lazarus, Judith Rabinowitz, and Barbara M.R. Marvin, Attorneys, Appellate Section; Eric Grant, Deputy Assistant Attorney General; Jeffrey H. Wood, Acting Assistant Attorney General; Environment and Natural Resources Division, United States

Department of Justice, Washington, D.C.; Matthew Kelly, Office of the Solicitor, United States Department of the Interior, Washington, D.C.; Austin T. Badger, Office of the General Counsel, National Indian Gaming Commission, Washington, D.C.; for Federal Defendants-Appellees.

Frank Lawrence (argued) and Zehava Zevit, Law Office of Frank Lawrence, Nevada City, California, for Tribally-Related Defendants-Appellees.

**OPINION**

W. FLETCHER, Circuit Judge:

Since at least 1912, a small group of Kumeyaay Indians have lived on a two-acre plot of land in Rancho Jamul, California, deeded to the Roman Catholic Diocese of Monterey and Los Angeles for use as an Indian cemetery. In 1981, the families residing there organized under the Indian Reorganization Act ("IRA"), 25 U.S.C. §§ 5101 *et seq.*, as the Jamul Indian Village. The Bureau of Indian Affairs ("BIA") approved the Village's constitution, and the Village has appeared on the BIA's published list of federally recognized Indian tribes ever since. *See* 84 Fed. Reg. 1,200, 1,202 (Feb. 1, 2019); 83 Fed. Reg. 34,863, 34,864 (July 23, 2018); 82 Fed. Reg. 4,915, 4,916 (Jan. 17, 2017); 81 Fed. Reg. 26,826, 26,828 (May 4, 2016); 80 Fed. Reg. 1,942, 1,944 (Jan. 14, 2015); 79 Fed. Reg. 4,748, 4,750 (Jan. 29, 2014); 78 Fed. Reg. 26,384, 26,386 (May 6, 2013); 77 Fed. Reg. 47,868, 47,870 (Aug. 10, 2012); 75 Fed. Reg. 60,810, 60,811 (Oct. 1, 2010); 74 Fed. Reg. 40,218, 40,220 (Aug. 11, 2009); 73 Fed. Reg. 18,553, 18,554 (Apr. 4, 2008); 72 Fed. Reg. 13,648, 13,649 (Mar. 22, 2007); 70 Fed. Reg. 71,194, 71,195

(Nov. 25, 2005); 68 Fed. Reg. 68,180, 68,181 (Dec. 5, 2003); 67 Fed. Reg. 46,328, 46,329 (July 12, 2002); 65 Fed. Reg. 13,298, 13,300 (Mar. 13, 2000); 63 Fed. Reg. 71,941, 71,943 (Dec. 30, 1998); 62 Fed. Reg. 55,270, 55,272 (Oct. 23, 1997); 61 Fed. Reg. 58,211, 58,212 (Nov. 13, 1996); 60 Fed. Reg. 9,250, 9,252 (Feb. 16, 1995); 58 Fed. Reg. 54,364, 54,367 (Oct. 21, 1993); 53 Fed. Reg. 52,829, 52,830 (Dec. 29, 1988); 51 Fed. Reg. 25,115, 25,116 (July 10, 1986); 50 Fed. Reg. 6,055, 6,056 (Feb. 13, 1985); 48 Fed. Reg. 56,862, 56,863 (Dec. 23, 1983); 47 Fed. Reg. 53,130, 53,132 (Nov. 24, 1982).

This case concerns the Village's status as a federally recognized Indian tribe.  In a suit challenging the Village's efforts to build a casino, two community organizations and several of their members (collectively, "JAC") contend that the Village is not a federally recognized Indian tribe.  Instead, JAC contends that the Village is only a community of adult Indians, not a historic tribe with inherent sovereign authority.  Therefore, according to JAC, the Village may not use its lands for gaming and is not protected by tribal sovereign immunity.

No tribunal has accepted this argument.  But that has not deterred litigants, including JAC and other members of the plaintiff organizations, from pressing similar claims in myriad actions before administrative agencies, state courts, and federal courts around the country since the early 1990s. In an opinion that we hope will finally put an end to these claims, we hold as follows.  The distinction JAC urges between historic tribes and other tribal entities organized under the IRA is without basis in federal law.  Jamul Indian Village is a federally recognized Indian tribe with the same privileges and immunities, including tribal sovereign

immunity, that other federally recognized Indian tribes possess. The Village's tribal sovereign immunity extends to its officers in this case.

Because we hold that the Village is protected by tribal sovereign immunity, we agree with the district court that the Village cannot be joined in this action and that the action cannot proceed in equity and good conscience without it. We therefore affirm the district court's judgment dismissing JAC's claims for failure to join a required party.

## I. Background

### A. The Jamul Indian Village

In 1912, the Coronado Beach Company deeded a small parcel in Rancho Jamul, San Diego County, California, to the Roman Catholic Diocese of Monterey and Los Angeles for use as an Indian cemetery. No more than a portion of the land has ever been used as a burial ground. On the remainder of the parcel, with the acquiescence of the Diocese, several families of Kumeyaay Indians have made their home for generations.

Beginning in the early 1970s, the families residing on the parcel sought to organize under the IRA. The Diocese and a local family transferred about six acres to the United States, including the greater part of the Indian cemetery and an adjoining parcel of private land, which the government accepted into trust for the benefit of the Jamul Indians. After the United States took this land into trust, the Superintendent of the Southern California Agency for the BIA recommended federal recognition of the Village and its inclusion on the list of recognized tribal entities published in the Federal Register.

The BIA authorized a constitutional election.  After a majority of eligible voters cast ballots in favor, the BIA approved the Village's constitution under the IRA on July 7, 1981.  The tribal constitution limited membership to those with one-half or more California Indian blood.

## B. Leadership Dispute and Subsequent Litigation

Trouble began for the Village in the early 1990s with a series of disputes about the Village's membership and leadership.  Faced with the prospect of declining membership as the Village's initial members died, the Village began considering reducing the blood quantum requirement for membership.  At about the same time, some members of the Village sought to recall officers elected in the Village's 1992 election.  *See Rosales v. Sacramento Area Dir.* (*Rosales I*), 32 IBIA 158, 159–63 (1998).  Those members held a recall election, which the BIA determined did not comport with the Village's constitution and declined to recognize.  *Id.* at 161. The Village's BIA-recognized government and its opponents held separate elections in 1995.  The Interior Board of Indian Appeals ("IBIA") ultimately reinstated the officers elected in the 1992 elections.  *Id.* at 167.

Meanwhile, the Village obtained authorization from the BIA to hold an election to amend its constitution to reduce the blood quantum requirement for membership from one-half to one-quarter.  The election approved the amendment in 1996.  The BIA rejected a challenge to the amendment brought by the tribal members opposed to the Village's government.  *See Rosales v. Sacramento Area Dir.*, 34 IBIA 50 (1999).  However, some members continued to dispute the amendment's validity.  They challenged every tribal election in which individuals of less than one-half Indian blood were

allowed to vote and held separate elections in 1997, 1999, and 2001. *Rosales v. United States* (*Rosales II*), 477 F. Supp. 2d 119, 124 (D.D.C. 2007) (holding that individuals who were not registered voters in the 1996 election lacked standing to challenge its results), *aff'd*, 275 F. App'x 1 (D.C. Cir. 2008).

Central to the arguments raised by the opponents of the Village's BIA-recognized tribal government in these suits was the theory that the Village was no more than a community of adult Indians created by the Department of the Interior and therefore was not a federally recognized Indian tribe with the same privileges and powers as a properly recognized historic tribe. Plaintiffs advanced this theory in challenges to tribal elections, to the beneficial ownership of the parcels held in trust by the United States for the Village, and to the Village's more recent efforts to build and operate a casino. *See, e.g.*, *Rosales II*, 477 F. Supp. 2d at 129; *Rosales v. United States*, 73 F. App'x 913 (9th Cir. 2003); *Rosales v. United States*, 477 F. Supp. 2d 213 (D.D.C. 2007). In a 2009 opinion holding that a claim by opponents of the Village's tribal government to a personal beneficial interest in the Village's trust land was time-barred, the Court of Federal Claims identified "no fewer than fourteen legal actions brought before tribal tribunals, administrative boards, and federal courts in California and the District of Columbia, all without success," presenting "these same and related issues." *Rosales v. United States*, 89 Fed. Cl. 565, 571 & n.2 (2009). Since then, both individuals and organizations affiliated with JAC have continued to press similar claims in both state and federal courts. *See, e.g.*, *Rosales v. Dep't of Transp.*, No. D066585, 2016 WL 124647 (Cal. Ct. App. Jan. 12, 2016) (unpublished); *Jamulians Against the Casino v. Dep't of Transp.*, No. C077806, 2016 WL 1253586 (Cal. Ct.

App. Mar. 30, 2016) (unpublished); *Rosales v. Dutschke*, 787 F. App'x 406, 407 (9th Cir. 2019).

## C. Procedural History

JAC filed this action challenging continued construction and operation of a casino on the Village's federal trust land. JAC's operative complaint invokes a host of state and federal statutory and constitutional provisions, but the gravamen of its claim is that the parcel on which the casino sits does not qualify as Indian land eligible for gaming under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.*, because the Village is only a community of adult Indians and not a federally recognized Indian tribe. The complaint also alleges that the federal government failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, in approving the Village's gaming ordinance and management contract. JAC named as defendants the Department of the Interior, the National Indian Gaming Commission, several federal officials at those agencies, five council members or officials of the Jamul Indian Village, and two contractors involved in construction of the casino. The complaint seeks relief including an injunction against further construction of the casino and a declaration that the Village's land is not "trust land under [tribal] government control" and is therefore "[in]eligible for tribal gaming."

Shortly after filing its operative complaint, JAC moved for a writ of mandate directing the federal defendants to complete a supplemental environmental impact statement and for a preliminary injunction. The district court denied the motion, and JAC appealed.

We heard argument in JAC's interlocutory appeal and affirmed. In a published opinion, we held that IGRA's mandatory deadline for approving a tribe's gaming ordinance displaced NEPA's default requirement that agencies conduct environmental review before undertaking major federal action. *Jamul Action Comm. v. Chaudhuri*, 837 F.3d 958 (9th Cir. 2016). In an accompanying memorandum disposition, we held that JAC had not shown a likelihood of success on the merits of its other claims and that any challenge to the federal government's decision to take land into trust for the benefit of the Village was foreclosed by this court's opinion in *Big Lagoon Rancheria v. California*, 789 F.3d 947 (9th Cir. 2015) (en banc). *See Jamul Action Comm. v. Chaudhuri*, 651 F. App'x 689 (9th Cir. 2016).

After our resolution of JAC's interlocutory appeal, the federal and tribal defendants moved to dismiss. The district court dismissed all claims for failure to join a required party, with the exception of JAC's NEPA claim related to the gaming management contract. While that NEPA claim was still pending, JAC filed another interlocutory appeal, which we dismissed for lack of jurisdiction. *See Jamul Action Comm. v. Chaudhuri*, No. 16-16442, 2017 WL 3611433 (9th Cir. June 15, 2017) (mem.). The district court granted summary judgment in favor of the federal defendants on JAC's remaining NEPA claim and entered judgment. JAC again appealed. That appeal is now before us.

Because JAC presents no argument on appeal related to its NEPA claim, we deem that issue waived and limit our analysis to the district court's dismissal of JAC's other claims for failure to join a required party. *See Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 485 (9th Cir. 2010) ("We review only issues that are argued specifically

and distinctly in a party's opening brief." (alterations and citation omitted)).

## II. Standard of Review

"We review a Rule 19 dismissal for abuse of discretion and underlying legal conclusions de novo." *Salt River Project Agric. Improvement & Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012). "Issues of tribal sovereign immunity are reviewed de novo." *Burlington N. & Santa Fe Ry. v. Vaughn*, 509 F.3d 1085, 1091 (9th Cir. 2007).

## III. Discussion

### A. Tribal Sovereign Immunity

We first address whether the tribal defendants—five current or former elected officers of the Village—are protected by tribal sovereign immunity in this suit. Because the answer to that question depends on whether the Village itself enjoys tribal sovereign immunity, we begin there.

#### 1. Sovereign Immunity of the Jamul Indian Village

"Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories. Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation." *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991) (citations omitted). Tribal sovereign immunity extends to both the governmental and commercial activities of a tribe, whether undertaken on or off its reservation. *See Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751,

754–55 (1998); *Cook v. AVI Casino Enters., Inc.*, 548 F.3d 718, 725 (9th Cir. 2008).

The scope and applicability of tribal sovereign immunity lie within the plenary control of Congress. *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014); *see Kiowa Tribe of Okla.*, 523 U.S. at 759 ("Like foreign sovereign immunity, tribal immunity is a matter of federal law."). As a matter of federal law, federal recognition of a tribe "affords important rights and protections to Indian tribes, including limited sovereign immunity." *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1273 (9th Cir. 2004). "Federal recognition may arise from treaty, statute, executive or administrative order, or from a course of dealing with the tribe as a political entity." *Id.* (quoting William C. Canby, Jr., *American Indian Law in a Nutshell* 4 (4th ed. 2004)). When the political branches of the federal government decide to recognize an Indian tribe, courts are obligated to respect that decision. *See United States. v. Holliday*, 70 U.S. (3 Wall.) 407, 419 (1865).

The Jamul Indian Village was recognized by the BIA in 1981, which authorized and oversaw its constitutional election. The Village has appeared on every list of federally recognized tribes that the agency has published since then. The Village maintains a government-to-government relationship with the United States, which has dealt with the Village as a political entity and provided it services reserved for federally recognized tribes.

JAC nonetheless contends that the Village is not a federally recognized tribe with the same privileges and immunities as other federally recognized Indian tribes. In the view of JAC, the BIA did not recognize the Village as a historic tribe that exercised inherent sovereign authority.

Instead, in its view, the BIA recognized the Village only as a created tribe—a community of adult Indians organized under the provisions of the IRA allowing the provision of benefits to individuals with one-half or more Indian blood.  *See* 25 U.S.C. § 5129.  JAC contends that because the Village is only a creation of the federal government, not an entity with inherent sovereign authority, it is not protected by tribal sovereign immunity.  JAC is wrong.

JAC principally relies on a 1993 letter sent by Carol Bacon, then Director of Tribal Services for the BIA, to the Chairman of the Village.  The letter responded to the Village's request to hold a Secretarial election to amend its constitution to allow membership of individuals with less than one-half Indian blood (an election that the Secretary of the Interior ultimately authorized in 1996).  Director Bacon threatened that the Village might lose its recognition status if it allowed broader membership.  According to Director Bacon, some "tribes" that the federal government allowed to organize under the IRA were not really tribes.  Some, like the Village, were only "communities of adult Indians" who "had no historical existence as self-governing units."  Because these "created tribes" were not inherently sovereign, she wrote, they "possess[ed] only those powers set forth in their IRA constitution."  Therefore, she wrote, a change in the Village's membership criteria "could jeopardize the Village's continued right to Federal recognition."

In the years leading up to Director Bacon's letter to the Village, the BIA had relied on this distinction between "created" and "historic" tribes when other recognized tribal entities had sought to change their membership criteria.  One of these tribes was the Pascua Yaqui Tribe of Arizona, and its conflict with the BIA over its membership caught the

attention of Congress. Like the Village, the Pascua Yaqui Tribe received a letter from (then Acting) Director Bacon in 1991 when the Tribe sought approval for a constitutional amendment to expand its membership rolls. *See To Amend the Act Entitled "An Act to Provide for the Extension of Certain Federal Benefits, Services, and Assistance to the Pascua Yaqui Indians of Arizona, and for Other Purposes: Hearing on H.R. 734 Before the Subcomm. on Native Am. Affs. of the H. Comm. on Nat. Res.*, 103d Cong. 80–96 (1993) (Exhibit J to statement of Albert Garcia, Chairman, Pascua Yaqui Tribe of Arizona). The letter explained that it was the BIA's position that because the Indians who lived on the Pascua Yaqui reservation were not always a "historic tribal unit," the group did not possess the same rights and powers as historic tribes. *Id.* at 83, 88. Citing a 1936 opinion from the Solicitor of the Interior, Director Bacon wrote that such adult Indian communities could exercise only a narrow set of delegated powers that did not include setting their own membership criteria. *See id.* at 81–85.

When Director Bacon presented this position to Congress, she met considerable resistance. *See, e.g.*, *id.* at 15–20 (questioning by Rep. Richardson, following statement of Carol Bacon); 140 Cong. Rec. 11,377 (1994) (statement of Rep. Richardson). Her testimony triggered a flurry of legislative activity. Within a year, Congress eliminated the distinction between "created" and "historic" tribes, both as to the Pascua Yaqui Tribe specifically and as to other "adult Indian communities" organized under the IRA. *See* Act of Oct. 14, 1994, Pub. L No. 103-357, § 1, 108 Stat. 3418, 3418 (declaring the Pascua Yaqui to be a historic tribe); Act of May 31, 1994, Pub. L. No. 103-263, § 5, 103 Stat. 707, 709 (codified as amended at 25 U.S.C. § 5123(f)–(g)) (forbidding classifications among federally recognized tribes). Congress

also enacted further reforms to limit the BIA's ability to withdraw federal recognition or limit the rights of a recognized tribe. *See* Federally Recognized Indian Tribe List Act of 1994, Pub. L. No. 103-454, 108 Stat. 4791. These reforms were designed, in large measure, to ensure that Indian tribal entities, once federally recognized and included on the published list of recognized tribes, were not treated differently based on whether they were "created" or "historic" tribes. *See* H.R. Rep. No. 103-781, at 3–4 (1994) ("[T]he BIA indicated that it intended to differentiate between federally recognized tribes as being 'created' or 'historic.' . . . Because this dichotomy ran so clearly counter to the intent of Congress and was outside the Department's authority, Congress quickly enacted legislation prohibiting the distinction." (footnote omitted) (citing Act of May 31, 1994)).

The Act of May 31, 1994, prohibits any agency decision under the IRA "that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes." *See* 25 U.S.C. § 5123(f)–(g). The purpose and effect of the Act was to eliminate the distinction between "created" and "historic" tribes. *See Rosales I*, 32 IBIA at 165 ("[T]he amendment was intended to end the distinction which had been drawn since at least 1936 between the powers of 'historic' and 'created' tribes."). That is precisely the distinction JAC urges here.

Even if the BIA intended the Village to have only a different and lesser status when the Village was first included on the list of recognized tribes, federal law no longer permits this distinction. Today, the Village enjoys the same

privileges and immunities as other federally recognized Indian tribes, including tribal sovereign immunity.

### 2. Sovereign Immunity of the Tribal Defendants

We next turn to whether the tribal officers sued in this case are protected by the Village's sovereign immunity. Although tribal sovereign immunity generally does not bar claims for prospective injunctive relief against tribal officers, we hold that in the circumstances of this case, the Village is the real party in interest. JAC's claims against the officers are therefore barred by the sovereign immunity of the Village.

Tribal sovereign immunity extends to tribal officers when "the sovereign entity is the 'real, substantial party in interest.'" *Cook*, 548 F.3d at 727 (quoting *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997)); *see Lewis v. Clarke*, 137 S. Ct. 1285, 1290–91 (2017). "In making this assessment, courts may not simply rely on the characterization of the parties in the complaint, but rather must determine in the first instance whether the remedy sought is truly against the sovereign." *Lewis*, 137 S. Ct. at 1290; *see also Maxwell v. County of San Diego*, 708 F.3d 1075, 1089 (9th Cir. 2013) (stating that it is the "remedy sought" that determines whether a suit against tribal officers may proceed). That a suit implicates a tribal officer's official duties does not by itself establish that the tribe is the real party in interest. *Maxwell*, 708 F.3d at 1088.

In suits for damages, "the general rule [is] that individual officers are liable when sued in their individual capacities." *Id.* at 1089; *see, e.g.*, *Lewis*, 137 S. Ct. at 1291 (rejecting argument that tribal employee was protected by sovereign immunity because he was acting within the scope of his

employment).  Suits that seek to recover funds from tribal coffers or establish vicarious liability of a tribe for damages, on the other hand, are barred by tribal sovereign immunity even when nominally styled as against individual officers. *See Maxwell*, 708 F.3d at 1088 (citing *Cook*, 548 F.3d at 727).

Suits seeking prospective injunctive relief ordinarily may proceed against tribal officers sued in their official capacities under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908). *Bay Mills Indian Cmty.*, 572 U.S. at 796.  "That doctrine permits actions for prospective non-monetary relief against state or tribal officials in their official capacity to enjoin them from violating federal law, without the presence of the immune State or tribe." *Salt River*, 672 F.3d at 1181 (citing *Ex parte Young*, 209 U.S. 123).  Declaratory relief may issue against tribal officers in the same circumstances.  *See Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 847–48 (9th Cir. 2002).

For *Ex parte Young* to apply, a plaintiff must point to threatened or ongoing unlawful conduct by a particular governmental officer.  The doctrine does not allow a plaintiff to circumvent sovereign immunity by naming some arbitrarily chosen governmental officer or an officer with only general responsibility for governmental policy. *Ex parte Young*, 209 U.S. at 157 ("In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.").

There are also limits to what sort of relief a plaintiff may seek under *Ex parte Young* without making the sovereign the real party in interest.  The Supreme Court has disallowed attempts to use the doctrine discussed in *Ex parte Young* to quiet title to a sovereign's property, to compel a governmental official to pay a sovereign's past legal obligation, or to obtain specific performance of a sovereign's contract.  *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997); *Edelman v. Jordan*, 415 U.S. 651 (1974); *Ex parte Ayers*, 123 U.S. 443 (1887).  These remedies, which disturb a sovereign's title to property or reach into its coffers, lie directly against the sovereign even when styled as a claim for injunctive relief against an individual governmental officer.

In *Coeur d'Alene*, the Supreme Court held that state sovereign immunity barred a suit in which the Coeur d'Alene Tribe of Idaho claimed ownership of submerged lands within its reservation.  The Tribe brought a trespass suit in an attempt to establish the boundary between reservation land and land owned by the State of Idaho.  The Tribe sought an injunction prohibiting named state officers "from regulating, permitting, or taking any action in violation of the Tribe's rights of exclusive use and occupancy, quiet enjoyment, and other ownership interest in the submerged lands" and a declaration that the Tribe held the exclusive right to their use and regulation.  *Coeur d'Alene*, 521 U.S. at 265.  The Tribe contended that its suit was not barred by the State's sovereign immunity because, like in *Ex parte Young*, the Tribe sought only prospective injunctive and declaratory relief against state officers engaged in trespassing conduct that the Tribe contended violated its rights under federal law.  The Court disagreed.  Although the Tribe had named state officers, not the State itself, the Court held that the suit was "the

functional equivalent of a quiet title action" and implicated Idaho's sovereign interests in its regulatory authority over the land in question. *Id.* at 281–82; *see also id.* at 289 (O'Connor, J., concurring in part). The State, not its officers, was the real party in interest, and so the suit was barred by the State's sovereign immunity.

JAC's suit falls outside the class of suits allowed under *Ex parte Young*. It is clear that the Village, not the named tribal officers, is the real party in interest. That is so both because JAC has named only an arbitrary collection of tribal policymakers as a substitute for the Village and because the suit seeks to extinguish or otherwise diminish the Village's beneficial interest in its federal trust land.

First, JAC fails to articulate any connection between the particular named tribal officers and any allegedly unlawful conduct. In its operative complaint, JAC named five tribal officers as defendants. JAC describes those individuals only as "council members or officials of the [Village]" in its description of the parties to the suit. It does not explain what responsibility any of those individuals have or had for the acts it contends are unlawful—specifically, construction of the casino—beyond their general role in the formulation of tribal policy. None of these individuals is mentioned elsewhere in the complaint, with the exception of former Chairman Hunter, who the complaint alleges signed management and development contracts for the casino on behalf of the Village. JAC's briefing to this court provides little further detail. It does not mention any of the named tribal officers except former Chairman Hunter, who it claims signed an easement deed allowing the federal government to take a portion of the Village's fee land into trust.

In essence, JAC has simply named Village officials as stand-ins for the tribal council. It is telling that the only specific conduct JAC identifies on the part of any named tribal officer is the signing of a contract and a deed on behalf of the Village. The object of JAC's suit is not to restrain future unlawful activity by particular tribal officers, but to call into question the status of the Village's property and the validity of its contracts.

Second, and more fundamentally, JAC's suit seeks a remedy that goes to the heart of the Village's sovereign and proprietary interests. JAC's complaint contends that the Village is "not a tribal government"; that it "never had powers of inherent sovereignty"; that it "is not a federally recognized tribe"; and that its land "is neither trust land, restricted Indian land nor reservation land" but is instead "property owned [in fee] by the United States." It seeks a declaration that the Village's land "is [not] trust land under [the Village's] government[al] control" and an injunction against further construction by the Village of a casino. Although the complaint also seeks equitable remedies against the federal defendants, those remedies rest on its contention that the Village is not a federally recognized tribe and seek to prevent the federal government from affording it the benefits to which recognized tribes are entitled.

The remedies JAC seeks here are at least as invasive of the Village's sovereign and proprietary interests as those sought against Idaho in *Coeur d'Alene*. As the plaintiffs did there, JAC challenges the Village's title in its land. The plaintiffs in *Coeur d'Alene* sought a declaration that submerged lands were reservation land rather than State land, and were thus not subject to the regulatory authority of the State. The Court held that the suit was barred by the State's

sovereign immunity.  Here, JAC seeks a declaration that the Village's federal trust land is not part of its reservation and is not subject to the regulatory authority of the Village.  JAC's suit does not stop at contesting the Village's ownership and authority over its land—it goes a step further still and challenges the Village's existence as a federally recognized tribe.  It disputes not only the geographical extent of the Village's sovereignty, but the very fact of its sovereignty.

In these circumstances, we have no trouble concluding that the Village, rather than the five council members and other officials JAC has named as defendants, is the real party in interest here.  We therefore hold that JAC's claims against the tribal defendants are barred by tribal sovereign immunity.

### B.  Dismissal for Failure to Join a Required Party

Federal Rule of Civil Procedure 19(a) requires joinder of parties whose presence is necessary to ensure complete and consistent relief among the existing parties or whose interests would be impeded were the action to proceed without them. When a required party cannot be joined, Rule 19(b) requires dismissal when the action cannot proceed in equity and good conscience in the absence of the required party.

We have held that Rule 19 requires a three-step inquiry. *See Salt River*, 672 F.3d at 1179.  We first determine whether an absent party is a required party; then whether joinder is feasible; and finally whether the case can fairly proceed in the party's absence.

Rule 19(a) requires a party to be joined if feasible in three circumstances, but only one is relevant here: when an absent party claims an interest in the subject matter of the litigation

that would be impeded were the suit to proceed without it. *See* Fed. R. Civ. P. 19(a)(1)(B)(i).  We hold that under this standard, the Village must be joined if feasible in this action.

To come within the bounds of Rule 19(a)(1)(B)(i), the interest of the absent party must be a legally protected interest and not merely some stake in the outcome of the litigation. *See Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affs.*, 932 F.3d 843, 852 (9th Cir. 2019); *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990).  "[A]n absent party has no legally protected interest at stake in a suit merely to enforce compliance with administrative procedures."  *Dine Citizens*, 932 F.3d at 852 (alteration in original) (quoting *Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*, 547 F.3d 962, 971 (9th Cir. 2008)).

When dealing with claims challenging federal actions that alter tribal rights, we have distinguished between those that would have "retroactive effects" on rights already enjoyed by a tribe and those "relat[ing] only to the agencies' future administrative process."  *Id.* at 852–53.  Accordingly, we have held that a tribe has an interest for purposes of Rule 19(a)(1)(B)(i) in a suit challenging a federal agency decision to reauthorize mining by the tribe, because the suit, if successful, would impair the tribe's existing lease, rights-of-way, and surface mining permits.  *See id.* at 853.  In other cases, we have found protected interests in challenges to existing tribal gaming licenses, but not those to the issuance of future licenses; and in suits seeking reallocation of past harvests, but not those seeking to change the procedures for future allocations.  *See Cahil Dehe Band*, 547 F.3d at 974; *Makah*, 910 F.2d at 559.

Here, the Village has a protected interest in the trust status of its land and in its status as a federally recognized tribe. Although JAC couches some of its claims as challenges to prospective agency decisions—such as the government's approval of the Village's gaming ordinance—the basis for its claims is its contention that the Village is not a recognized tribe and that its land therefore is not Indian land held in trust on its behalf by the federal government. As in *Dine Citizens*, these challenges to prospective agency decisions would have far-reaching retroactive effects on the Village's existing sovereign and proprietary interests.

We also hold that these interests would be impeded were this action to proceed in the Village's absence. *See* Fed. R. Civ. P. 19(a)(1)(B)(i). Both tribal officers and federal agencies may, in some circumstances, adequately represent the interests of an absent tribe. When tribal officers are properly sued in their official capacities under *Ex parte Young*, their interests align with those of the tribe, and they may adequately represent the tribe's interests. *See Salt River*, 672 F.3d at 1180. Here, however, the tribal defendants are immune from suit, and so, like the Village, they cannot be joined.

Nor can the federal defendants adequately represent the Village's interests in this case. We have held that the United States, based on its trust relationship with Indian tribes, generally may "adequately represent an Indian tribe unless there exists a conflict of interest between the United States and the tribe." *Sw. Ctr. for Biological Diversity v. Babbitt*, 150 F.3d 1152, 1154 (9th Cir. 1998) (per curiam); *see also Ramah Navajo School Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1351 (D.C. Cir. 1996) ("the United States may adequately represent that interest as long as no conflict exists between

the United States and the nonparty beneficiaries"). Applying that standard, we have held that federal defendants would not adequately represent an absent tribe where their obligations to follow relevant environmental laws were in tension with tribal interests, *see Dine Citizens*, 932 F.3d at 855, or where individual Indians challenged a federal decision concerning the status of tribal land, *see Clinton v. Babbitt*, 180 F.3d 1081 (9th Cir. 1999). This case, like *Clinton*, concerns the status of tribal lands that JAC contends are owned by individual Indians rather than the Village, thus calling into question the government's ability to adequately represent the Village's interests were the case to proceed. Because the Village has protected interests in this litigation that no existing party would adequately represent, Rule 19(a) requires its joinder.

Having concluded that the Village is a party required to be joined if feasible, the remaining steps of the Rule 19 analysis are straightforward. We have already held that the Village is protected by tribal sovereign immunity; its joinder in this action is therefore infeasible. The balancing of equitable factors under Rule 19(b) almost always favors dismissal when a tribe cannot be joined due to tribal sovereign immunity. *See Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996); *see also Dine Citizens*, 932 F.3d at 857 ("[T]here is a 'wall of circuit authority' in favor of dismissing actions in which a necessary party cannot be joined due to tribal sovereign immunity—'virtually all the cases to consider the question appear to dismiss under Rule 19, regardless of whether [an alternate] remedy is available, if the absent parties are Indian tribes invested with sovereign immunity.'" (alteration in original) (quoting *White v. Univ. of Cal.*, 765 F.3d 1010, 1028 (9th Cir. 2014)).

This case, where JAC's claims go directly to the Village's most important interests, is no exception. Equity and good conscience do not permit an action disputing the Village's status as a federally recognized tribe and its ownership of land in a suit in which the Village cannot be joined. We agree with the district court that the action should be dismissed for failure to join a required party.

## Conclusion

The Jamul Indian Village is protected by tribal sovereign immunity, just as is every other federally recognized Indian tribe. That immunity bars a suit like this one, attacking the Village's title in land and its status as a sovereign entity, from proceeding in its absence. We therefore affirm the district court's judgment dismissing the action for failure to join a required party.

**AFFIRMED**.